Jeffrey S. Jacobovitz (pro hac vice to be submitted)
Justin Ferraro (pro hac vice to be submitted)
ARNALL, GOLDEN, GREGORY LLP
2100 Pennsylvania Avenue, Suite 350S
Washington, D.C. 20037
Phone: (202) 677-4056
Facsimile: (202) 677-4057
Email: jeffrey.jacobovitz@agg.com

Carl J. Oreskovich, WSBA #12779
Andrew M. Wagley, WSBA #50007
ETTER, McMAHON, LAMBERSON,
VAN WERT & ORESKOVICH, P.C.
618 West Riverside Avenue, Suite 210
Spokane, WA  99201
Phone: (509) 747-9100
Facsimile: (509) 623-1439 2
Email:  carl@ettermcmahon.com

Charles R. Macedo (pro hac vice to be submitted)
David Goldberg (pro hac to be submitted)
AMSTER, ROTHSTEIN & EBENSTEIN LLP
405 Lexington Ave
New York, NY 10174
Phone: (212) 336-8000
Facsimile:  (212) 336-8001
Email: cmacedo@arelaw.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WASHINGTON

|  |  |
|---|---|
| CODY ALLEN EASTERDAY,<br><br>        Plaintiff, | No. _____ |

COMPLAINT—Page 1

| | |
|---|---|
| v.<br><br>TYSON FRESH MEATS, INC.,<br><br>Defendant. | **COMPLAINT** |

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................3

JURISDICTION AND VENUE . .................................................................4

PARTIES. ....................................................................................................5

FACTUAL ALLEGATIONS ......................................................................6

    A. Contracting Arrangement Between Easterday and Tyson Through the Years ....................................................................................................6

    B. Background of the Market.................................................................17

    C. Relevant Market. ..............................................................................18

    D. Anticompetitive Conduct and Effects.............................................22

    E. Harm to competition ........................................................................24

    F. Antitrust Standing ...........................................................................28

    G. Effect on Interstate Commerce.......................................................28

COUNTS.....................................................................................................29

PRAYER FOR RELIEF .............................................................................35

DEMAND FOR TRIAL BY JURY............................................................36

ETTER, MᶜMAHON, LAMBERSON,
VAN WERT & ORESKOVICH, P.C.
618 WEST RIVERSIDE AVENUE, SUITE 210
SPOKANE, WASHINGTON 99201   (509) 747-9100

Plaintiff Cody Allen Easterday ("Plaintiff" or "Mr. Easterday") brings this Complaint against Defendant, Tyson Fresh Meats, Inc. ("Tyson" or "Defendant") for injunctive relief and monetary damages as well as such other relief as specified herein, as follows:

**INTRODUCTION**

1.    This is an antitrust and unfair competition case directed at the anti-competitive, unfair, abusive, unjustly discriminatory, and deceptive acts and practices, among others by Defendant. Through the wielding of immense market power, resulting from acquisition and consolidation, Defendant has created a monopsony market in the Pacific Northwest region of the U.S. ("Pacific Northwest") – being Washington, Oregon, and Idaho – whereby cattle feeders in that region have no reasonable choice but to contract with Defendant despite the anti-competitive, unfair, abusive, unjustly discriminatory, and deceptive acts and practices of Defendant, including as to pricing, contract terms, and contract performance. The Defendant has misused its economic power over cattle feeders and contracts, and committed violations of the Packers and Stockyards Act of 1921 ("PSA"), the Sherman Antitrust Act of 1890 ("Sherman Act"), and the Washington State Consumer Protection Act ("WCPA").

2.    Plaintiff was a cattle feeder and President of Easterday Ranches, Inc.

COMPLAINT—Page 3

ETTER, McMAHON, LAMBERSON,
VAN WERT & ORESKOVICH, P.C.
618 WEST RIVERSIDE AVENUE, SUITE 210
SPOKANE, WASHINGTON 99201    (509) 747-9100

("Easterday Ranches") for over 20 years and during much of that time worked with Tyson, to provide a steady supply of fed cattle for harvest at Tyson's plant located near Pasco, Washington. As set forth in greater detail below, from 2010 through 2020, Plaintiff and his company, Easterday Ranches, were financially harmed by the anti-competitive, unfair, abusive, unjustly discriminatory, and deceptive acts and practices, among others, by Defendant, including being charged erroneous fees, interest, and commissions, in violation of federal and state law, including the PSA.

## JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, because this action arises under Section 202 of the PSA, 7 U.S.C. § 181 et seq, and Section 1 of Sherman Act, 15 U.S.C. §2. This Court also has subject matter jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over any state cause of action set forth herein, including as to violations of the WCPA.

4.     This Court has personal jurisdiction over Defendant because Defendant transacted business, maintained substantial contacts, and committed

COMPLAINT—Page 4

illegal overt acts, as discussed in more detail below, in the Eastern District of Washington ("District"). Defendant should, therefore, have foreseen the possibility of being brought before this Court to answer for any illegal acts relating to its business conducted in the District. This Court also has personal jurisdiction over the Defendant under PSA § 209(b), which allows violations of the PSA to be enforced by any United States district court of competent jurisdiction. 7 U.S.C. § 209(b)(2).

5.    Venue is proper in the District under 28 U.S.C. § 1391, because Plaintiff's farm and feedlot were located in the District and Defendant's beef packing plant, where the fed cattle were delivered by Plaintiff to Defendant, is located in the District. Throughout the course of the Plaintiff's and Defendant's relationship, various personnel of Defendant would routinely visit Plaintiff's farm and feedlot in the District. Additionally, to the extent 7 U.S.C. § 209(b), is interpreted as venue provision, venue is also proper in the District under that statute as a court of competent jurisdiction.

## **PARTIES**

6.    Plaintiff, Cody Allen Easterday ("Easterday"), is a citizen of the State of Washington.

7.    On information and belief, Defendant Tyson Fresh Meats, Inc.

COMPLAINT—Page 5

ETTER, M<sup>c</sup>MAHON, LAMBERSON,
VAN WERT & ORESKOVICH, P.C.
618 WEST RIVERSIDE AVENUE, SUITE 210
SPOKANE, WASHINGTON 99201   (509) 747-9100

("Tyson Fresh Meats"), is a wholly owned subsidiary of Tyson Foods, Inc., which is a publicly traded corporation listed on the New York Stock Exchange (NYSE: TSN). Tyson Fresh Meats is a corporation organized in Delaware, with its principal place of business located at 2200 W. Don Tyson Pkwy, Springdale, Arkansas 72762.

## **FACTUAL ALLEGATIONS**

**A.    Contracting Arrangement Between Easterday and Tyson Through the Years**

8.    Mr. Easterday has been an owner of Easterday Ranches since purchasing the company in 1997 and served as the President from 1998 through January 2021. From 2008 through 2022 until its liquidation through bankruptcy, Easterday Ranches operated as an S-corporation.

9.    Easterday Ranches' corporate headquarters was located at 5235 Industrial Way, Pasco, WA 99301 and operated three finishing yards (or feedlots) with a combined total feeding capacity of approximately 75,000 head as of the end of 2020.  The finishing yards consisted of (1) the South Feedlot located at 144503 Nine Canyon Rd., Kennewick, WA 99336 (originally acquired in 1997 and expanded several times over the following 25 years); (2) the North Feedlot located at 8230 Blanton Rd, Eltopia, WA 99330, (property acquired in 2009;

ETTER, McMAHON, LAMBERSON,
VAN WERT & ORESKOVICH, P.C.
618 WEST RIVERSIDE AVENUE, SUITE 210
SPOKANE, WASHINGTON 99201   (509) 747-9100

construction completed in 2010), and (3) Royal City Feedlot located at 14999 Rd 12.5W, Royal City, WA (long-term lease entered into/improvements made in 2014).  In addition to the three finishing yards, while in operation, Easterday Ranches either operated directly or contracted with approximately 2-6 "grow yard" facilities dependent on the time of year.

10.    During the course of its operation, Mr. Easterday, in his personal capacity, owned, in part, land on which Easterday Ranches operated and fed cattle.

11.    With the expansion arising out of the construction of the North Feedlot which was completed in 2010, Mr. Easterday through Easterday Ranches became one of the largest suppliers of fed cattle to Tyson in the Pacific Northwest.

12.    Prior to 2010, Easterday Ranches and Tyson operated under a long-standing contractual arrangement whereby Plaintiff procured and purchased lots (i.e., groups) of feeder cattle in which Easterday Ranches and Tyson each owned 50 percent ("50/50 Arrangement"). Feeder cattle are young cattle ready to be placed in a feedlot for fattening. Under the 50/50 Arrangement, both parties shared equally in the risk of loss – both production and market – or potential profits arising out of feeding cattle to finished weight.  Tyson paid Easterday

ETTER, McMAHON, LAMBERSON,
VAN WERT & ORESKOVICH, P.C.
618 WEST RIVERSIDE AVENUE, SUITE 210
SPOKANE, WASHINGTON 99201   (509) 747-9100

Ranches for custom feeding services on Tyson's 50% share of the cattle, which provided for a fixed margin on that portion of the cattle on feed and helped to offset any losses on cattle that typically occur as part of the cattle cycle. This arrangement kept each parties' incentives aligned to assure a supply of cattle to the plant in a manner that was profitable through both the feeding and processing stages of the supply chain.

13.    Sometime in 2009, Tyson and Mr. Easterday had a discussion to increase the capacity of his feedlots, to which Mr. Easterday agreed under the presumption that the long-standing 50/50 Arrangement would continue. The 50/50 arrangement existed for the majority of the thirteen years since Cody Easterday acquired an interest in Easterday Ranches. The annual throughput was increased to 120,000 head of cattle and under the presumption that the 50/50 agreement would continue Mr. Easterday assumed he would have the full risk of the cattle on half that number (60,000 head).

14.    Following Mr. Easterday's agreement to increase the feedlot capacity, Easterday Ranches obtained a construction/term loan for $6.266 million from a lender, Rabo Agrifinance, Inc. (the "Construction Loan"), and reinvested past profits to fund the expansion of feedlot capacity by acquiring property and building the North Feedlot at a total investment cost of over $13 million.

ETTER, McMAHON, LAMBERSON,
VAN WERT & ORESKOVICH, P.C.
618 WEST RIVERSIDE AVENUE, SUITE 210
SPOKANE, WASHINGTON 99201   (509) 747-9100

15.    Mr. Easterday personally guaranteed the Construction Loan.  The Construction Loan contained provisions that (a) required completion of construction, and (b) allowed the lender to complete construction if Easterday Ranches failed to do so and recover all amounts advanced including construction completion costs from Easterday Ranches and Mr. Easterday regardless of whether or not the feedlot was operational.  The loan was also cross-defaulted to loan agreements that various of Mr. Easterday's other business interests had entered into, such that a default under the Construction Loan would be a default on loans owed by his various other business interests.  Once Mr. Easterday and Easterday Ranches entered into the Construction Loan, Mr. Easterday had no practical choice but to complete the project in order to preserve his other business interests.

16.    In or around the spring of 2010, after Tyson had successfully enticed Mr. Easterday to expand Easterday Ranches feeding capacity, and only after Easterday Ranches had completed a substantial portion of the new construction necessary to increase feedlot capacity and thus spent proceeds of the Construction Loan, Defendant, through its representative and agent, informed Mr. Easterday that Tyson wanted to change the terms of their longstanding arrangement and that Tyson no longer wanted to own and feed cattle under the

ETTER, McMAHON, LAMBERSON,
VAN WERT & ORESKOVICH, P.C.
618 WEST RIVERSIDE AVENUE, SUITE 210
SPOKANE, WASHINGTON 99201   (509) 747-9100

existing 50/50 Arrangement, which was the agreement Mr. Easterday relied upon in deciding to expand his feedlot capacity. Instead, Tyson determined that Easterday Ranches would own and feed the cattle prior to their delivery as finished cattle ready for slaughter under Tyson's so-called "Pioneer Model" contracting arrangement, i.e., a "Cattle Feeding Agreement." Under the new terms, Tyson required Mr. Easterday to shoulder 100% of the risk of any profit shortfall or loss associated with purchasing, feeding, and caring for all of the cattle (approximately 120,000 head per year) prior to their delivery to Tyson at the Tyson Pasco plant. After having invested heavily in his relationship with Tyson, particularly the capital invested into the multimillion-dollar feedlot expansion in-progress at the time, and because of a lack of other options for marketing his cattle, Mr. Easterday felt he had no choice but to accept the new "Pioneer Model" arrangement and sign Tyson's Cattle Feeding Agreement as presented in a take-it-or-leave it fashion by Tyson's employee.

17.    In the context of the above circumstances, beginning in at least 2010 and continuing through 2020, Easterday Ranches entered into a series of written Cattle Feeding Agreements with Tyson drafting the agreements that represented the "Pioneer Model" arrangement (each, a "Cattle Feeding Agreement") and presenting them to Mr. Easterday for signature.  Under each Cattle Feeding

ETTER, McMAHON, LAMBERSON,
VAN WERT & ORESKOVICH, P.C.
618 WEST RIVERSIDE AVENUE, SUITE 210
SPOKANE, WASHINGTON 99201   (509) 747-9100

Agreement, Easterday Ranches agreed to procure feeder cattle (which typically weigh between 600 and 900 pounds) on behalf of Tyson and feed, care, and manage the cattle until they reached a weight of approximately 1,250 to 1,500 pounds, when they were ready to be sent to slaughter as finished cattle at Tyson's plant located in Pasco, Washington. The Tyson plant has a daily capacity of over 2000 head, and the plant employs approximately 1,200 people in the state of Washington.

18.    More recently, Easterday Ranches and Tyson Fresh Meats entered into a Cattle Feeding Agreement ("2017 CFA"), effective as of February 20, 2017.

19.    On August 20, 2020, Easterday Ranches and Tyson Fresh Meats signed a purported amendment to the 2017 CFA ("2020 Amendment"), effective August 20, 2020, extending the terms of the 2017 CFA through August 20, 2021.

20.    On December 7, 2020, Easterday Ranches and Tyson signed a Confirmation of Ownership Agreement ("2020 Confirmation"), effective December 7, 2020, to confirm Tyson's ownership of feeder cattle under the 2017 CFA and 2020 Amendment.

21.    Each of the 2017 CFA, the 2020 Amendment, and 2020 Confirmation were drafted by Tyson and presented to Mr. Easterday for signing. The absence of Easterday Ranches' ability to negotiate more reasonable terms was indicative

COMPLAINT—Page 11

of Tyson's significant market power.

22.    Mr. Easterday understood at the time he signed each agreement that he did not have the ability to negotiate with Tyson any of the terms or conditions of such agreements.  Indeed, in 2018, when he tried to renegotiate pricing terms, he was rejected.

23.    Mr. Easterday, as president of Easterday Ranches, signed the 2017 CFA, the 2020 Amendment, and the 2020 Confirmation.

24.    When entering the 2017 CFA, Tyson also required Mr. Easterday to execute a personal guaranty ("Personal Guaranty") under which Mr. Easterday personally guaranteed the "full and timely payment, performance, and satisfaction by EASTERDAY RANCHES, INC. of all of their obligations to" Tyson Fresh Meats pursuant to the 2017 CFA. *See* 2017 CFA, pg. 5.

25.    Under the terms of the Cattle Feeding Agreements, Tyson advanced Easterday Ranches funds to purchase, house, and feed the cattle at the Easterday feedlots. Easterday Ranches was required to reimburse Tyson all advanced funds, including interest and a $15/per head guaranteed payment upon final settlement. These illegal actions by Tyson contributed to the alleged loss Easterday Ranches and Plaintiff sustained.

26.    The agreement provided that the scheduling and delivery of cattle

COMPLAINT—Page 12

would be coordinated between Easterday Ranches and Tyson. However, in practice, Tyson exerted complete control over the timing of delivery. This ability, typically held solely by the feed yard, had a direct impact on the profitability for a particular lot of cattle. Without this autonomy, a feedlot operator cannot choose to sell finished cattle at a time and weight that is most profitable.

27.    Per the respective CFAs, the price for the cattle was determined by a grid pricing scheme using Tyson's proprietary formula, which was based on a 5-area average weighted price of fed cattle sold by feedlots in Texas/Oklahoma/New Mexico; Kansas; Nebraska; Colorado; and Iowa/Minnesota (see further discussion of this in Section B below).

28.    At the time of delivery of cattle to the Tyson Pasco Plant, Easterday would not be paid the price outright, rather Tyson would calculate a final settlement amount by netting the sales price for the cattle against (a) the amount it paid to Easterday Ranches for the purchase, feed, and care of cattle, (b) interest charged to Easterday Ranches on the amount paid by Tyson to Easterday Ranches for the purchase, feed, and care of cattle <u>and</u> (c) a $15 per head guaranteed profit to Tyson.

29.    The 2017 CFA states – "**EASTERDAY RANCHES, INC. understands that EASTERDAY RANCHES, INC. is not guaranteed a profit**

ETTER, M<sup>c</sup>MAHON, LAMBERSON,
VAN WERT & ORESKOVICH, P.C.
618 WEST RIVERSIDE AVENUE, SUITE 210
SPOKANE, WASHINGTON 99201   (509) 747-9100

**and that EASTERDAY RANCHES, INC. bears the market risk that the cattle fed hereunder will not return amounts sufficient to return TFM's invested capital (including interest) plus $15 per head.**"

30.    The 2017 CFA provides that, while management of market risks arising under the 2017 CFA is the sole responsibility of Easterday Ranches, Easterday Ranches "has the option to use [Tyson] CME contracts, both basis and actual basis, to help manage his risk."    Tyson provided advice and information about the market and their opinion of what to trade and when.

31.    In addition to the personal guarantee by Mr. Easterday, Easterday Ranches was also required to assume all of the financial risk of the operation under the 2017 CFA and to indemnify Tyson against cattle deaths.    Thus, as personal guarantor, Mr. Easterday was required to bear the financial risk if Easterday Ranches did not perform.

32.    Despite statutory requirement, even when Tyson did owe Easterday Ranches for a particular lot of cattle, as a matter of course, Tyson failed to timely pay Easterday Ranches within 48 hours of the sale.

33.    In or around 2013, Tyson approached Mr. Easterday, to obtain his permission to use Mr. Easterday's name and photograph with a "Cody's Beef" joint venture in Japan for Tyson Customer Nippon Ham.

COMPLAINT—Page 14

ETTER, M<sup>c</sup>MAHON, LAMBERSON,
VAN WERT & ORESKOVICH, P.C.
618 WEST RIVERSIDE AVENUE, SUITE 210
SPOKANE, WASHINGTON 99201    (509) 747-9100

34.    Under the "Cody's Beef" joint venture, Mr. Easterday would supervise the feeding of the cattle by Easterday Ranches, on the Easterday feedlots, which were in turn sold to Tyson for resale to Nippon Ham Group ("Nippon Ham") in Japan.[1]

35.    Between approximately 2016 and November 2020, Mr. Easterday falsely provided invoices under the Cattle Feeding Agreements to Tyson for which he has been ordered to provide restitution less any offsets. On November 30, 2020 Mr. Easterday revealed this activity to Tyson and proceeded to cooperate with, and facilitate, a Tyson audit of Mr. Easterday and Easterday Ranches' books and records.

36.    On December 7, 2020, Tyson falsely represented to Mr. Easterday that it would not seek criminal charges, and Mr. Easterday agreed to execute an ownership agreement, without counsel present, whereby Mr. Easterday transferred ownership to Tyson of cattle owned by Easterday Ranches that had not been invoiced to Tyson. This agreement also included language affirmatively stating that under the terms of the 2017 CFA, Tyson owned the cattle fed by Easterday Ranches at all times prior to delivery. This language was contrary to

---

[1] The joint venture between Tyson and Mr. Easterday concerning "Cody's Beef" is the subject of a separate litigation commenced by Mr. Easterday against Tyson in *Easterday v. Tyson Fresh Meats Inc* (4:2022-cv-05155).

COMPLAINT—Page 15

Mr. Easterday's understanding of the 2017 CFA and contrary to the direct representations made by Tyson to Mr. Easterday in at least 2010 and 2014, and onward.

37.    If Tyson owned the cattle during their time spent in the Easterday feedlot, this implies that Tyson was indirectly paying Mr. Easterday an anticompetitive suppressed price for feeding cattle for Tyson, and that price was anticompetitive due to Tyson's exertion of monopsony market power.

38.    Further, if Tyson owned the cattle prior to their delivery to Tyson, then Tyson was acting in an anticompetitive manner by exerting its monopsony market power to shift the economic risk of the cattle ownership to Mr. Easterday and Easterday Ranches (without the economic benefit of the cattle ownership), as Mr. Easterday and/or Easterday Ranches was (i) providing a personal guarantee under the 2017 CFA, (ii) shouldering 100% of the market and other risks relating to the cattle prior to delivery to Tyson under the 2017 CFA, (iii) paying an interest rate on the advanced funds, (iv) paying a guaranteed $15 per head profit to Tyson and (v) unable to control when cattle were delivered and harvested.

39.    Upon information and belief, Tyson inconsistently reported the ownership of the cattle to regulatory authorities.

COMPLAINT—Page 16

ETTER, McMAHON, LAMBERSON,
VAN WERT & ORESKOVICH, P.C.
618 WEST RIVERSIDE AVENUE, SUITE 210
SPOKANE, WASHINGTON 99201    (509) 747-9100

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32

**B.** **Background of the Market**

40.    There are only two packers of fed cattle in the Pacific Northwest – Tyson and AgriBeef.  AgriBeef is an independent packer, and approximately 70-75% of AgriBeef's cattle supply come from their own feedlots**.**

41.    In 2006, Tyson shuttered its packing plant in Boise, Idaho, leaving only one Tyson packing plant in the Pacific Northwest, which is located in Pasco, Washington.  Tyson accounted for approximately 80-85% of the fed cattle purchased in the Pacific Northwest from 2006 to 2020.

42.    Beginning in 2010, Tyson changed its business model in the Pacific Northwest to no longer explicitly "own" the cattle. Rather, Tyson required cattle feeders to carry all the financial risk in feeding and caring for cattle until they reached market weight under their "Pioneer Model" contracting arrangement. The Pioneer Model contract has been the subject of other litigation by another company.

43.    When Mr. Easterday attempted to seek a change to the terms of this arrangement and renegotiate their contracts, Tyson exercised its market power and threatened to shut down the Pasco packing plant, which was the only remaining Tyson packing plant in the Pacific Northwest and also the only viable

COMPLAINT—Page 17

offtake arrangement for Easterday given the size of the Easterday feeding operations and the limited additional capacity of AgriBeef – the only other processing plant in the region. As noted above, Agribeef maintained its own supply of approximately 70-75% of its needs. Upon information and belief, Tyson made similar threats to other cattle feeding companies.

## C. Relevant Market

44.    The relevant geographic market is defined based upon the ability of those affected (in this case cattle feeders) to escape the effects of the alleged monopsony power. Fed cattle (i.e., cattle that are ready for harvest) are expensive to transport due to their size. Additional costs due to shrink (cattle losing weight) and risk of injury and mortality increase as shipping distances increase. In a 2011 survey of large feedlots (capacity for 1,000 head or more) conducted by the U.S. Department of Agriculture, it was documented that cattle being shipped to slaughter (i.e., fed cattle) traveled a mere 166 miles, on average.[1] The USDA report goes on to explain that feeding and processing facilities are regionally co-located to allow for expedited delivery for slaughter and to minimize transport time and stress on cattle. This indicates that the relevant geographic market for

---

[1] https://www.aphis.usda.gov/animal_health/nahms/feedlot/downloads/feedlot2011/Feed11_dr_PartI_1.pdf, p.80.

ETTER, MᶜMAHON, LAMBERSON,
VAN WERT & ORESKOVICH, P.C.
618 WEST RIVERSIDE AVENUE, SUITE 210
SPOKANE, WASHINGTON 99201   (509) 747-9100

fed cattle in this case is the Pacific Northwestern area of the U.S. including Washington, Oregon, and Idaho.

45. Figure 1 is a map of the Pacific Northwest region that shows a concentric circle of 200 miles around Easterday Ranches. Within this circle of 200 miles, Tyson's only domestic competitor in the beef packing business is Agri Beef, which is mostly vertically integrated and not a viable outlet for Easterday Ranches, given the large size of Easterday's feedlots. Far outside the circle is the JBS packing house in Hyrum, Utah. The JBS Hyrum Utah facility is over 600 miles from Easterday Ranches and requires travel over multiple mountain passes which are subject to closure in winter due to travel conditions. The JBS plant was too distant to provide an economically feasible outlet for Mr. Easterday's fed cattle.

*Figure 1. Map of the Pacific Northwest Large FSIS Fed Cattle Processing Plants*

ETTER, MᶜMAHON, LAMBERSON, VAN WERT & ORESKOVICH, P.C.
618 WEST RIVERSIDE AVENUE, SUITE 210
SPOKANE, WASHINGTON 99201   (509) 747-9100

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17



18    46.    In order for Easterday Ranches to escape the alleged monopsony

19
20    power that Tyson exerted, Easterday would need to find an alternative processor

21
22    to purchase its fed cattle within a reasonable shipping radius. As shown in Figure

23    1, there are only two processing operations within the relevant shipping area –

24
25    Tyson and AgriBeef. Given that AgriBeef is vertically integrated and did not have

26
27    sufficient capacity to harvest all of Easterday Ranch's fed cattle, Easterday was

28    left with only one buyer – Tyson. Due to the lack of available alternative beef

29
30    processors in the Pacific Northwest region of the U.S., the Defendant possessed

31
32    sufficient market power to enable them to exercise monopsony power when

ETTER, McMAHON, LAMBERSON,
VAN WERT & ORESKOVICH, P.C.
618 WEST RIVERSIDE AVENUE, SUITE 210
SPOKANE, WASHINGTON 99201    (509) 747-9100

dictating the pricing and other terms in fed cattle procurement contracts (e.g., CFA) to Easterday and other cattle feeding operations in the Pacific Northwestern U.S.

47.    The relevant product market identifies product(s) that are reasonably interchangeable between the product at issue (fed cattle) and potential substitutes that the buyer may consider. Easterday Ranches was not able to feasibly switch its production systems away from feeding cattle in favor of other alternatives (such as crop production, dairy production, etc.) in order to escape the price suppression effectuated by Tyson's alleged monopsony power. Cattle feeding operations are capital intensive operations requiring substantial capital investments that are business specific. As such, cattle feeders (including Easterday) will often continue to operate, even when prices are suppressed, in an attempt to cover their loan payments and/or continue to try and cover their fixed costs.

48.    On the procurement side of the market, the Defendant's processing plant is species-specific, i.e., it is a processing plant that harvests *cattle.* As such, the Defendant and other cattle processors in the area (i.e., AgriBeef) would not be willing or able to procure other species of animals (e.g., swine, broilers) to fill their processing operations. Likewise, processors for other species of animals

ETTER, M<sup>c</sup>MAHON, LAMBERSON,
VAN WERT & ORESKOVICH, P.C.
618 WEST RIVERSIDE AVENUE, SUITE 210
SPOKANE, WASHINGTON 99201   (509) 747-9100

(e.g., swine, broilers) would not be willing or able to procure cattle to fill their processing operation.  For these reasons, the relevant product market in this case is the market for fed cattle within 200 miles of the Easterday Ranch.

**D. <u>Anticompetitive Conduct and Effects</u>**

49.    Through Tyson's control of the open cattle purchasing market, threatening behavior, and pressure to enter into contracts with anticompetitive terms for Tyson's benefit, Tyson exerted significant market power over the supply side of the market for fed cattle in Pacific Northwest.

50.    Tyson purchased its competitor Iowa Beef Processors, Inc. ("IBP") in 2001 and throughout the next two decades consolidated its control over the beef open market in the Pacific Northwest. One of the ways Tyson exerted control was through forcing cattle feeders, such as, but not exclusively, Mr. Easterday, to enter into contracts with anticompetitive and unfair terms and pricing and other terms in Tyson's favor, such as the "Pioneer Model" CFAs.

51.    Tyson has attempted to retroactively claim that under the 2017 CFA, 2020 Amendment, and 2020 Confirmation, ownership transferred from Easterday Ranches to Tyson prior to Easterday's delivery of the cattle to the Pasco plant. Tyson's position on December 2020 regarding the ownership of the cattle under the 2017 CFA is inconsistent with the prior representations that Tyson

ETTER, M<sup>c</sup>MAHON, LAMBERSON,
VAN WERT & ORESKOVICH, P.C.
618 WEST RIVERSIDE AVENUE, SUITE 210
SPOKANE, WASHINGTON 99201    (509) 747-9100

made to Mr. Easterday. As a result, either Tyson was unfair and deceptive towards Mr. Easterday requiring Easterday Ranches to pay interest and fees it would not have otherwise paid if Tyson in fact owned the cattle, or Tyson was, upon information and belief, deceptive towards Washington state and the U.S. Department of Agriculture in regulatory filings in order to receive an advantage in the market.

52.    Tyson was aware, or should have been aware, that the contract terms were unfair and deceptive, and that its control over the regional market left no viable alternatives for Mr. Easterday but to continue supplying Tyson with cattle. Additionally, Tyson's threats to close the Pasco plant in response to Mr. Easterday's attempts to renegotiate the contract terms, exhibits Tyson's knowledge that they were cattle feeders' only option in the region and indicative of Tyson's market power.

53.    By pushing Plaintiff to continually increase feedlot capacity, Tyson created a supplier, in Plaintiff, who's operations were too large to sell cattle elsewhere. Also, because Plaintiffs resources were so heavily invested in his contract with Tyson, for which he was sustaining losses, Plaintiff could not acquire alternative means of financing due to insufficient collateral.

54.    The Pacific Northwest market for fed cattle is the relevant product

COMPLAINT—Page 23

market, and the Pacific Northwest is the relevant geographic market.

55.    Tyson possessed and exercised monopsony power in the market for purchasing cattle for slaughter in the Pacific Northwest.

**E. <u>Harm to Competition</u>**

56.    Competition and Plaintiff have been harmed in the Relevant Market outlined above due to Defendant's actions, which has resulted in feedlot operators being paid less than the competitive price, and meatpackers, specifically in this case Tyson, profiting.

57.    According to a report by Vox Media, as of 2019, the top 4 cattle meatpacking companies (including Tyson), process over 85 percent of all cattle produced in the United States. *See* "How 4 companies control the beef industry," Vox Media, at 6:50, https://www.youtube.com/watch?v=3_hCLjUrK1E. Because just 4 companies purchase and process such a large percentage of U.S.-produced beef, this creates a bottleneck between cattle feedlot owners and the wholesale market for beef, benefiting the meatpackers. *See id.* At 7:30.

58.    The improved fortunes of the beef packers are captured in Figure 2, which reports the "packer spread"—the gap between the prices that packers pay to feedlots (the farm price) versus the wholesale price of beef received by packers. Figure 2 reports annual average data from 2010-2020, and as shown in

ETTER, M<sup>c</sup>MAHON, LAMBERSON,
VAN WERT & ORESKOVICH, P.C.
618 WEST RIVERSIDE AVENUE, SUITE 210
SPOKANE, WASHINGTON 99201   (509) 747-9100

the Figure from 2015, wholesale beef prices began to diverge from the price of fed cattle (i.e., the farm price shown in Figure 2), enriching the meat packers. The price of fed cattle had historically stayed within $30 to $40 per-cwt (i.e., hundredweight) of the wholesale price of beef. But in 2015, the spread between those prices increased dramatically up to $90, and the price of fed cattle became detached from the wholesale price of beef.

*Figure 2. Packer Spread Between Fed Cattle and Wholesale Beef*



Source: https://www.ers.usda.gov/data-products/meat-price-spreads/

59.    Prior to 2006, when Tyson operated meatpacking plants in both Pasco,

ETTER, McMAHON, LAMBERSON,
VAN WERT & ORESKOVICH, P.C.
618 WEST RIVERSIDE AVENUE, SUITE 210
SPOKANE, WASHINGTON 99201   (509) 747-9100

Washington and Boise, Idaho, cattle feeders could solicit competing bids for the purchase of slaughter-ready cattle. However, by shutting down the Boise meatpacking plant in 2006, Defendant eliminated competition, creating a bottleneck of only one geographically feasible meatpacking plant for cattle feeders and ranchers located in the Pacific Northwest.

60.    This bottleneck, created by Defendant, provides Tyson with significant market power, which it wielded in negotiation of pricing and other terms with feedlot operators. As described above, in approximately 2019 when Mr. Easterday attempted to renegotiate the terms of the 2017 CFA based on changing market conditions, Tyson refused to negotiate and threatened Mr. Easterday that if he did not accept Tyson's terms, they would simply shut down the Pasco meatpacking plant.

61.    Additionally, as a result of cattle feeding agreements like the 2017 CFA entered into by Easterday, in his individual capacity and as President of Easterday Ranches, Defendants removed a significant amount of fed cattle from the price discovery process of competitive bid auctions. Because beef packers are bypassing the auction process and offering "take it or leave it" pricing and other terms to feedlot owners directly, this limits market transparency, limits the number of competing bids cattle feeders can solicit, and correspondingly reduces

COMPLAINT—Page 26

competition.

62.    Further, when Tyson needed additional cattle supply for the Pasco plant, Tyson would ship cattle to Pasco from hundreds of miles away from cattle feeders in the Midwest, choosing to take a loss on those cattle due to the high shipping costs, to avoid paying Mr. Easterday, and other cattle feeders in the Pacific Northwest, higher competitive prices on the open market. This price maneuvering ensured that the price Tyson paid cattle feeders providing cattle under a Pioneer Model arrangement escaped supply and demand conditions of a competitive fed cattle market.

63.    The impact of this market concentration, the use of cattle feeding agreements, rather than open market purchases in the relevant market, and other unfair and deceptive practices has resulted in Tyson not only receiving its cattle supply on non-negotiated prices and terms, but also enabling Tyson to lower the amounts it pays to cattle feeders, while still collecting the same or increased prices charged to wholesalers.

64.    Further, Plaintiff knows of at least 3 other instances where Tyson entered into cattle feeding agreements with ranchers based on their "Pioneer Model," and in every instance the rancher that was a party to that CFA struggled to meet its one-sided, Tyson-favored, terms.

COMPLAINT—Page 27

ETTER, McMAHON, LAMBERSON,
VAN WERT & ORESKOVICH, P.C.
618 WEST RIVERSIDE AVENUE, SUITE 210
SPOKANE, WASHINGTON 99201    (509) 747-9100

65.    Tyson purchased fed cattle from Easterday Ranches at a base price with a grid adjustment for quality. The base price was the "5 area" average weighted price of fed cattle sold by feedlots in Texas/Oklahoma/New Mexico; Kansas; Nebraska; Colorado; and Iowa/Minnesota. The 5 area base price was offered to Easterday on a take it or leave it basis, even though a competitive price for fed cattle in the Northwestern U.S. would be higher than the 5 area price because the Pacific Northwest is both a feed and cattle deficit region.

### F. Antitrust Standing

66.    Plaintiff has suffered injuries as a result of Defendant's actions, including but not limited to, the loss of income that he would have received as President and owner of Easterday Ranches absent Defendant's conduct, as well as, damage to the value and forced liquidation of land comprising of his real estate and improvements, which were owned, in part, in Plaintiff's personal capacity, and not by Easterday Ranches. Plaintiff has further suffered injury as a result of personal guarantees he was forced to undertake.

67.    The injuries to Plaintiff described herein, which are caused by the Defendants' illegal antitrust activities, are the types of injuries that the antitrust laws and PSA were intended to provide redress. They are direct injuries, not speculative, and there is no potential for duplicative recovery.

COMPLAINT—Page 28

### G. Effect on Interstate Commerce

68.    The anticompetitive conduct that caused Plaintiff's injuries, as alleged herein, has had a direct, substantial, and reasonably foreseeable effect on domestic commerce in the United States.

69.    Plaintiff contracted with Defendant to provide a steady supply of cattle for Defendant to slaughter, package, and sell as beef across state lines in an uninterrupted flow of interstate commerce.

70.    Accordingly, the anticompetitive effects of Defendants' actions have manifested primarily in commerce in the United States, where feedlot operators were paid less than the competitive price and the Defendant profited.

### COUNT I
### VIOLATION OF PACKERS AND STOCKYARDS ACT

71.    Plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

72.    Title 7 U.S.C. §192 provides, in pertinent part, "[i]t shall be unlawful for any packer with respect to livestock . . . to . . . (a) [e]ngage in or use any unfair, unjustly discriminatory, or deceptive trade practice or device; or . . . (b) . . . subject any particular person or locality to any undue or unreasonable prejudice or disadvantage in any respect."

COMPLAINT—Page 29

ETTER, McMAHON, LAMBERSON,
VAN WERT & ORESKOVICH, P.C.
618 WEST RIVERSIDE AVENUE, SUITE 210
SPOKANE, WASHINGTON 99201   (509) 747-9100

73.     Unfair, unjustly discriminatory, and deceptive trade practices under the Packers and Stockyards Act are further addressed in Code of Federal Regulations in Part 201 of Title 9. Section 201.98 states "[n]o packer or dealer shall, in connection with the purchase of livestock in commerce, charge, demand, or collect from the seller of the livestock any compensation in the form of commission, yardage, or other service charge unless the charge is for services mandated by law or statute and is not inconsistent with the provisions of the Act."

74.     7 U.S.C. §221 provides, in pertinent part, "[e]very packer . . . shall keep such accounts, records, and memoranda as fully and correctly disclose all transactions involved in his business, including the true ownership of such business by stockholding or otherwise."

75.     7 U.S.C. §228b provides, in pertinent part, "[e]ach packer . . . shall, before the close of the next business day following the purchase of livestock and transfer of possession thereof, deliver to the seller or his duly authorized representative the full amount of the purchase price[.]" Additionally, "[a]ny delay or attempt to delay by a market agency, dealer, or packer purchasing livestock, the collection of funds as herein provided, or otherwise for the purpose of or resulting in extending the normal period of payment for such livestock shall be considered an "unfair practice" in violation of this chapter."

COMPLAINT—Page 30

ETTER, McMAHON, LAMBERSON, VAN WERT & ORESKOVICH, P.C.
618 WEST RIVERSIDE AVENUE, SUITE 210
SPOKANE, WASHINGTON 99201    (509) 747-9100

76.    Title 7 U.S.C. §209 further provides that, "[i]f any person subject to this chapter violates any of the provisions of this chapter . . . relating to the purchase, sale, or handling of livestock, . . . he shall be liable to the person or persons injured or persons injured thereby for the full amount of damages sustained in consequence of such violation." Such liability may be enforced "by suit in any district court of the United States of competent jurisdiction[.]"

77.    Beginning on or about June 21, 2010, Tyson Fresh Meats and Easterday Ranches entered into a series of cattle feeding contracts, which substantially altered the terms of their long-standing business arrangement that had existed with Tyson or its predecessor company IBP for over 10 years. The most recent cattle feeding contract was the 2017 CFA as extended and amended by the 2020 Amendment.  Under the 2017 CFA and 2020 Amendment, Easterday Ranches and Mr. Easterday were required to sustain all of the risk of market and other losses relating to the cattle prior to delivery to Tyson; pay interest on money advanced by Tyson to purchase cattle that Easterday Ranches allegedly did not own; pay a guaranteed profit of $15 per head to Tyson; compensate Tyson for unavoidable and inevitable cattle deaths and sickness; suffer inequitable treatment and cede all control over market-ready determination of the cattle, which perpetually favored Tyson in both the risk Tyson would have to hold to

ETTER, McMAHON, LAMBERSON,
VAN WERT & ORESKOVICH, P.C.
618 WEST RIVERSIDE AVENUE, SUITE 210
SPOKANE, WASHINGTON 99201   (509) 747-9100

maintain its supply of cattle and the price Tyson would ultimately pay for cattle. Moreover, Mr. Easterday had to provide a personal guarantee of Easterday Ranches' obligations under the 2017 CFA and 2020 Amendment.

78.    When Mr. Easterday tried to re-negotiate the terms of Easterday Ranches contract with Tyson in approximately 2019, Tyson threatened to shut down the Pasco packing plant, which was the only packing plant within reasonable delivery distance from the Easterday feedlots.

79.    Tyson willfully and wrongfully obtained and/or maintained its monopsony in the fed cattle market by engaging in unfair, unjustly discriminatory, and deceptive practices set forth herein.

80.    As a direct, foreseeable, and proximate result of Defendants' unfair, unjustly discriminatory, inequitable, and deceptive conduct, Plaintiff has suffered damages, in an amount to be proven at trial.

## COUNT II
## VIOLATION SECTION 2 OF THE SHERMAN ACT

81.    Plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

82.    Upon information and believe, Defendant manipulated the relevant product and the relevant geographic market by using its market power in the fed

COMPLAINT—Page 32

ETTER, McMAHON, LAMBERSON,
VAN WERT & ORESKOVICH, P.C.
618 WEST RIVERSIDE AVENUE, SUITE 210
SPOKANE, WASHINGTON 99201    (509) 747-9100

cattle market to create a monopsony. This took place because Tyson accounted for 80-85% of fed cattle purchased in the relevant geographic market.

83.    Defendant had specific intent to create a monopsony in the fed cattle market in the Pacific Northwest.

84.    Defendant possessed sufficient market power to succeed in this anti-competitive conduct.

85.    Defendant's anticompetitive conduct described above impacted fed cattle prices received by Plaintiff and other cattle feeders.

86.    As a proximate result of the Defendant's unlawful conduct, Plaintiff suffered injury to his business and property, in an amount to be proven at trial.

## COUNT III
## VIOLATION OF WASHINGTON STATE ANTITRUST STATUTE

87.    Plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

88.    To establish an unfair competition claim under the Washington Consumer Protection Act ("WCPA"), a plaintiff must show that (1) an unfair or deceptive act or practice, (2) occurred in the course of trade or commerce, (3) impacted the public interest, (4) injured the plaintiff's business or property, and (5) was caused by the defendant. *See Hangman Ridge Training Stables, Inc. v.*

ETTER, McMAHON, LAMBERSON,
VAN WERT & ORESKOVICH, P.C.
618 WEST RIVERSIDE AVENUE, SUITE 210
SPOKANE, WASHINGTON 99201   (509) 747-9100

*Safeco Title Ins. Co.*, 105 Wash.2d 778, 719 P.2d 531, 533-34, 539 (Wash. 1986)

("[P]rivate [W]CPA plaintiffs must establish all five elements.").

89.    WCPA, RCW §19.86.093 provides that "[i]n a private action in which

an unfair or deceptive act or practice is alleged under RCW §19.86.020, a

claimant may establish that the act or practice is injurious to the public interest

because it: (1) Violates a statute that incorporates this chapter; (2) Violates a

statute that contains a specific legislative declaration of public interest impact; or

(3)(a) Injured other persons; (b) had the capacity to injure other persons; or (c)

has the capacity to injure other persons."

90.    Defendant entered into cattle feeding agreements with at least 4 cattle

feeders, including Plaintiff, based on Defendant's "Pioneer Model," which

includes the unlawful, unfair, and deceptive terms and practices described in the

preceding paragraphs. On information and belief, in each of those instances the

producer that was a party to their CFA suffered injury and struggled to meet its

one-sided, Tyson-favored pricing and other terms. Further, Tyson has shown that

it has the capacity to injury other cattle feeders, not including Plaintiff, now and

in the future. Upon information and belief, unless relief is granted by this Action,

Tyson is likely to continue to exercise its market power and utilize illegal, unfair,

and deceptive acts and practices to manipulate other cattle feeders in the future

COMPLAINT—Page 34

to enter into similar arrangements to the detriment of such cattle feeders and the market as a whole.

91.    Defendant's anticompetitive conduct described above impacted fed cattle prices received by Plaintiff and other cattle feeders.

92.    As a proximate result of the Defendant's unlawful conduct, Plaintiff suffered injury to his business and property, in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

a) Judgment that Defendants' conduct violates the Packers and Stockyards Act, 7 U.S.C. §§ 192, 221, and 228b; and Section 2 of the Sherman Act, 15 U.S.C. § 1.

b) Judgement that Defendants' conduct violates the Washington Consumer Protection Act §19.86.20;

c) Award Plaintiff treble damages (including, without limitation, lost profits), together with costs of this action, including reasonable attorneys' fees.

d) Grant permanent injunctive relief against Defendant to remedy the ongoing anticompetitive effects of Defendants' unlawful conduct;

ETTER, McMAHON, LAMBERSON,
VAN WERT & ORESKOVICH, P.C.
618 WEST RIVERSIDE AVENUE, SUITE 210
SPOKANE, WASHINGTON 99201    (509) 747-9100

e) Award Plaintiff pre- and post-judgement interest at the highest legal rate from and after the date of service of this Compliant to the extent provided by law on the total amount awarded;

f) Grant such other and further relief as the Court deems just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial on all matters so triable.

RESPECTFULLY SUBMITTED this 13th day of February, 2023.

By:  /s/ Carl J. Oreskovich
     Carl J. Oreskovich, WSBA #12779
     Andrew M. Wagley, WSBA #50007
     Attorneys for Plaintiff Cody Allen Easterday

     *Applying for Pro Hac Vice:*
     ARNALL GOLDEN GREGORY LLP
     Jeffrey Jacobovitz (Applying for *Pro Hac* Vice)
     D.C. Bar No. 346569
     Justin Ferraro (Applying for *Pro Hac Vice*)
     Virginia Bar No. 92226
     1775 Pennsylvania Ave, NW
     10th Floor
     Washington D.C. 20006
     Telephone: (202) 677-4056
     Facsimile: (202) 677-4057
     Emails: jeffrey.jacobovitz@agg.com
             justin.ferraro@agg.com

ETTER, McMAHON, LAMBERSON,
VAN WERT & ORESKOVICH, P.C.
618 WEST RIVERSIDE AVENUE, SUITE 210
SPOKANE, WASHINGTON 99201   (509) 747-9100

1

2                  AMSTER, ROTHSTEIN & EBENSTEIN LLP

3                  Charles R. Macedo (Applying for *Pro Hac Vice)*

4                  NY Bar No. 2328318

5                  David Goldberg (Applying for *Pro Hac Vice*)

6                  NY Bar No. 5134093

7                  Amster, Rothstein & Ebenstein LLP

8                  90 Park Avenue

9                  New York, NY 10016

10                Telephone: (212) 336-8000

11                Facsimile:  (212) 336-8001

12                Email:      cmacedo@arelaw.com

13                                dgoldberg@arelaw.com

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

31

32

COMPLAINT—Page 37